**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**

---

LINDA HURLEY and REV. REX STEWART,
Duly Registered Voters in the State of New York;
ROBERT JACKSON, RICHARD N.
GOTTFRIED, YUH-LINE NIOU; ANITA
THAYER and JONATHAN WESTIN,
Individually and as Co-Chairs of the New York
State Committee of the Working Families Party
and Members of the Executive Board of the New
York State Committee of the Working Families
Party; THE NEW YORK STATE COMMITTEE
OF THE WORKING FAMILIES PARTY; THE
EXECUTIVE BOARD OF THE NEW YORK
STATE COMMITTEE OF THE WORKING
FAMILIES PARTY; and THE WORKING
FAMILIES PARTY OF NEW YORK STATE,

Case No. 1:20-cv-

Plaintiffs,

v.

PETER S. KOSINSKI, as the Co-Chair of the New
York State Board of Elections; DOUGLAS A.
KELLNER, as the Co-Chair of the New York
State Board of Elections; ANDREW J. SPANO, as
a Commissioner of the New York State Board of
Elections; TODD D. VALENTINE, as Co-
Executive Director of the New York State Board
of Elections; and ROBERT A. BREHM, as Co-
Executive Director of the New York State Board
of Elections,

Defendants.

---

## PLAINTIFFS' MEMORANDUM OF LAW IN SUPPORT OF THEIR MOTION FOR A PRELIMINARY INJUNCTION

## TABLE OF CONTENTS

TABLE OF AUTHORITIES ............................................................................................ iii

INTRODUCTION ........................................................................................................... 1

PRELIMINARY STATEMENT ..................................................................................... 1

STATEMENT OF FACTS .............................................................................................. 2

    The Working Families Party ..................................................................................... 2

    Conflict between the NYS Democratic Party and NYS WFP ................................... 3

    The Commission and the New Election Law ............................................................ 4

    The FY 2021 Budget Bill .......................................................................................... 7

ARGUMENT .................................................................................................................. 9

I.     THIS COURT SHOULD ENJOIN THE APPLICATION OF NY
      ELECTION LAW SECTION 2-114 AND RESTORE THE PARTY
      AND CANDIDATE QUALIFICATION THRESHOLDS TO THEIR
      PRIOR LEVELS ..................................................................................................... 9

    A.    STANDARDS FOR INJUNCTIVE RELIEF ........................................................ 9

    B.    PLAINTIFFS HAVE SUFFERED AND ARE SUFFERING
           IRREPARABLE HARM ..................................................................................... 11

    C.    PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ....................... 13

          1.    ELECTION LAW SECTION 2-114 IS FACIALLY
                  INVALID BECAUSE IT SEVERELY RESTRICTS
                  PLAINTIFFS' FIRST AMENDMENT RIGHTS OF
                  ASSOCIATION AND SPEECH ............................................................. 13

          2.    THE BALLOT ACCESS REQUIREMENTS IN THE
                  APRIL 3D LAW VIOLATE PLAINTIFFS' FOURTEENTH
                  AMENDMENT RIGHTS TO EQUAL PROTECTION
                  AND DUE PROCESS .............................................................................. 18

          3.    THE BALLOT ACCESS REQUIREMENTS IN THE
                  APRIL 3D LAW CANNOT SURVIVE STRICT SCRUTINY ............... 19

a.      THE BALLOT ACCESS REQUIREMENTS IN
        THE APRIL 3D LAW HAVE NO CONNECTION
        TO A COMPELLING STATE INTEREST ...................................20

b.      THE BALLOT ACCESS REQUIREMENTS IN
        THE APRIL 3D LAW ARE NOT NARROWLY
        TAILORED.........................................................................................22

4.      THE BALLOT ACCESS REQUIREMENTS IN THE
        APRIL 3D LAW WOULD NOT SURVIVE EVEN A
        LOWER LEVEL OF SCRUTINY.............................................24

D.      THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF ...................24

E.      INJUNCTION WILL SERVE THE PUBLIC INTEREST ...................................25

II.     THE UNCONSTITUTIONAL BALLOT ACCESS PROVISIONS
        SHOULD BE SEVERED FROM THE CAMPAIGN FINANCE PROVISIONS............25

RELIEF REQUESTED........................................................................................................30

CONCLUSION.................................................................................................................30

## <u>TABLE OF AUTHORITIES</u>

### <u>Cases</u>

*Amarasinghe v. Quinn*,
    148 F. Supp. 2d 630 (E.D. Va. 2001) ................................................................................. 13

*Anderson v. Celebrezze*,
    460 U.S. 780 (1983) ........................................................................................... passim

*Asa v. Pictometry Intern. Corp.*,
    757 F. Supp.2d 238 (W.D.N.Y.2010) ................................................................................. 30

*Baer v. Meyer*,
    728 F.2d 471 (10th Cir. 1984) ........................................................................................... 17

*Brookins v O'Bannon*,
    699 F2d 648 (3d Cir 1983) ................................................................................................. 28

*Buckley v. Am. Constitutional Law Found., Inc.*,
    525 U.S. 182 (1999) ........................................................................................................... 14

*Buckley v. Valeo*,
    424 U.S. 1 (1976) ............................................................................................................... 27

*Bullock v. Carter*,
    405 U.S. 134 (1972) ........................................................................................................... 13

*Burdick v. Takushi*,
    504 U.S. 428 (1992) ................................................................................................... 15, 24

*Cal. Democratic Party v. Jones*,
    530 U.S. 570 (2000) ........................................................................................................... 16

*Chobani, LLC v. Dannon Co., Inc.*,
    157 F. Supp. 3d 190 (N.D.N.Y. 2016) ............................................................................... 30

*Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*,
    356 F.3d 226 (2d Cir. 2004) .............................................................................................. 11

*Credico v. New York State Bd. Of Elections*,
    751 F. Supp. 2d 417 (E.D.N.Y. 2010) ............................................................................... 12

*Democratic Party of U.S. v. Wisconsin ex rel. La Follette*,
    450 U.S. 107 (1981) ........................................................................................................... 16

*Dillon v. New York State Bd. of Elections*,
    No. 05 Civ. 4766, 2005 WL 2847465 (E.D.N.Y. Oct. 31, 2005) ....................................... 12, 13

*Doyle v. Suffolk County,*
    786 F.2d 523 (2d. Cir.)........................................................................... 28

*Elrod v. Burns,*
    427 U.S. 347 (1976) ............................................................................... 13

*Environmental Encapsulating Corp. v. City of New York,*
    855 F.2d 48 (2d. Cir. 1988)................................................................... 28

*Eu v. S.F. Cty. Democratic Cent. Comm.,*
    489 U.S. 214 (1989)........................................................................ 15, 16

*Evergreen Ass'n, Inc. v. City of N.Y.,*
    740 F.3d 233 (2d. Cir. 2014)................................................................. 23

*Executive Benefits Ins. Agency v. Arkinson,*
    573 U.S. 25 (2014)................................................................................. 27

*Faiveley Transp. Malmo AB v. Wabtec Corp.,*
    559 F.3d 110 (2d Cir. 2009)............................................................ 10, 11

*Farrior v. Sodexho, U.S.A.,*
    953 F.Supp. 1301 (N.D.Ala.1997)........................................................ 28

*Free Enterprise Fund v. Public Company Accounting Oversight Bd.,*
    561 U.S. 477 (2010)............................................................................... 27

*Free Libertarian Party, Inc. v. Spano,*
    314 F. Supp. 3d 444 (E.D.N.Y. 2018) .................................................. 20

*Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton,*
    841 F.3d 133 (2d Cir. 2016).............................................................. 9, 10

*Gonsalves v. New York State Bd. of Elections,*
    974 F. Supp. 2d 191 (E.D.N.Y. 2013) .................................................. 11

*Green Party of N.Y. State,*
    389 F.3d 411 (2d Cir. 2004)............................................. 17, 19, 20, 23

*Green Party of New York State v. New York State Bd. of Elections,*
    267 F. Supp. 2d 342 (E.D.N.Y. 2003) ............................................ 10, 12

*Green Party of Tenn. v. Hargett,*
    791 F.3d 684 (6th Cir. 2015) .......................................................... 18, 19

*Harman v. Forssenius,*
    380 U.S. 528 (1965)............................................................................... 11

*Hirschfeld v. Bd. Of Elections in N.Y.C*,
  984 F.2d 35 (2d Cir. 1993)................................................................ 25

*Hynes v. Tomei*,
  92 N.Y.2d 613 (1998) ...................................................................... 29

*Jenness v. Fortson*,
  403 U.S. 431 (1971).......................................................................... 18

*Jolly v. Coughlin*,
  76 F.3d 468 (2d Cir. 1996)............................................................... 12

*Klein v. City of San Clemente*,
  584 F.3d 1196(9th Cir. 2009) .......................................................... 13

*Kusper v. Pontikes*,
  414 U.S. 51 (1973)............................................................................ 13

*Leavitt v Jane L.*,
  518 U.S. 137 (1996).......................................................................... 28

*Lerman v. Bd. of Elections in City of NY*,
  232 F.3d 135 (2d Cir. 2000).............................................................. 20

*Libertarian Party of Ill. v. Scholz*,
  872 F.3d 518 (7th Cir. 2017) ...................................................... 15, 16

*Libertarian Party of Ohio v. Husted*,
  2014 WL 11515569 (S.D. Ohio January 1, 2014) ............................ 19

*Louk v. Cormier*,
  218 W.Va. 81 (2005) ........................................................................ 28

*Make the Rd. New York v. Cuccinelli*,
  419 F. Supp. 3d 647 (S.D.N.Y. 2019)............................................... 25

*Mastrovincenzo v. City of New York*,
  435 F.3d 78 (2d Cir. 2006)............................................................... 10

*National Advertising Co. v. Town of Niagara, United States*,
  942 F.2d 145 (2d. Cir. 1991)............................................................ 29

*New York State Superfund Coal., Inc. v. New York State Dep't of Envt'l Conservation*,
  75 N.Y.2d 88 (1989) ......................................................................... 29

*New York v. U.S.*,
  505 U.S. 144 (1992).......................................................................... 27

*No Spray Coal., Inc. v. City of New York*,
    252 F.3d 148 (2d Cir. 2001).......................................................................... 10

*Norman v. Reed*,
    502 U.S. 279 (1992)..................................................................................... 16

*N.Y. Progress & Prot. PAC v. Walsh*,
    733F.3d 483, 486 (2d Cir. 2013)............................................................. 13, 25

*Pennsylvania Fed'n of Teachers v. School Dist. of Philadelphia*,
    506 Pa. 196 (1984)....................................................................................... 28

*People ex rel. Alpha Portland Cement Co. v. Knapp*,
    230 N.Y. 48 (1920) ...................................................................................... 29

*People Ex. rel. Schneiderman v. Actavis PLC*,
    787 F.3d 638 (2d Cir. 2015)......................................................................... 10

*Perry v. Schwarzenegger*,
    704 F. Supp. 2d 921 (N.D. Cal. 2010) ......................................................... 20

*Price v. New York State Bd. of Elections*,
    540 F.3d 101 (2d Cir. 2008)................................................................. *passim*

*Reynolds v. Sims*,
    377 U.S. 533 (1964)....................................................................................... 1

*Rockefeller v. Powers*,
    (Rockefeller II), 78 F.3d 44 (2d Cir. 1996)................................................... 14

*Rossito-Canty v. Cuomo*,
    86 F. Supp. 3d 175 (E.D.N.Y. 2015) ........................................................... 11

*State v. Alaska Democratic Party*,
    426 P.3d 901 (Alaska 2018).......................................................................... 29

*Statharos v. New York City Taxi & Limousine Comm'n*,
    198 F.3d 317 (2d Cir. 1999).......................................................................... 12

*Stiens v. Fire & Police Pension Ass'n*,
    684 P.2d 180 (Colo.1984).............................................................................. 28

*Thomas v. New York City Bd. of Elections*,
    898 F. Supp. 2d 594 (S.D.N.Y. 2012)........................................................... 10

*Timmons v, Twin Cities Area New Party*,
    520 U.S. 351 (1997)....................................................................................... 24

*Town of Islip v. Caviglia,*
   141 A.D.2d 148 (2nd Dep't 1988) ........................................................ 28

*United States v. Adler's Creamery,*
   107 F.2d 987 (2d Cir. 1939) ................................................................ 30

*United States v. Booker,*
   543 U.S. 220 (2005) ........................................................................... 27

*Williams v. Rhodes,*
   393 U.S. 23 (1968) ............................................................ 13, 15, 18, 19

*Williams-Yulee v. Fla. Bar,*
   575 U.S. 433 (2015) ........................................................................... 20

*Winter v. Nat. Res. Def. Council, Inc.,*
   555 U.S. 7 (2008) ......................................................................... 10, 25

*Yick Wo v. Hopkins,*
   118 U.S. 356 (1886) ............................................................................. 1

## Statutes

28 U.S.C. § 1983 ...................................................................................... 18

N.Y. Elec. Law § 1-104(3) ....................................................................... 21

## Other Authorities

11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure
   § 2948 (2d ed. 1995) ......................................................................... 30

Carl Campanile, Cuomo Panel Moves Closer to Keeping Working Families off the Ballot ......... 5

https://www.politico.com/states/new-york/albany/story/2019/10/25/Cuomo-quietlypresses-to-weaken-his-working-families-party-nemesis-1225974A, p. 3 ................................................... 5

## INTRODUCTION

This action is brought to vindicate the fundamental principle that in a democracy there is no right more important than the right to vote. Plaintiffs Working Families Party and the individual Plaintiffs respectfully submit this Memorandum of Law and the accompanying Declarations of Sochie Nnaemeka dated May 29, 2020 (the "Nnaemeka Decl."), Richard Winger dated May 13, 2020 (the "Winger Decl."), Hoonpyo Lee a.k.a. Chisun Lee dated May 29, 2020 (the "Lee Decl."), and Kevin W. Goering dated May 29, 2020 (the "Goering Decl."), and the exhibits thereto, in support of their motion for a preliminary injunction.

## PRELIMINARY STATEMENT

More than a century ago, the Supreme Court declared that the right to vote is a "fundamental political right, because preservative of all rights." *Yick Wo v. Hopkins*, 118 U.S. 356, 370 (1886). *See Reynolds v. Sims*, 377 U.S. 533, 561-62 (1964) ("Undoubtedly, the right of suffrage is a fundamental matter in a free and democratic society."). This case involves the deliberate and unlawful interference with that fundamental right by the government of the state of New York.

In late March 2020, New York's typically opaque budget negotiations between the Executive and Legislative branches were even less transparent and more rushed than usual due to restrictions imposed as a result of the coronavirus pandemic. On April 2, with no opportunity to debate the relevant provisions, the legislature voted for, and on April 3 the Governor signed a budget bill  that included a section creating a new system of public financing for state elections and a section a changing the state's election law to wipe out virtually all of the State's minor political parties. (part zzz of S7508-B/A9598-B, the "April 3d Bill.").  Winger Decl. ¶ 6.

1

The new law set a floating vote threshold that essentially triples the number of votes that a minor party must reach to obtain and retain its status as a party. It also added the requirement that a minor party must do so every two years, exceeding the new threshold for votes in both Presidential and Gubernatorial elections. This represented a dramatic change. For the last 170 years, New York has allowed parties to retain their ballot status by meeting a threshold for votes in each gubernatorial election.

It is this legislation that is at issue in this litigation. The dramatic change it makes in New York's Election Law was designed to destroy smaller political parties and discourage new parties from forming. If the relief requested herein is not granted, plaintiff Working Families Party will lose the ballot line it has held since 1998 after this November's election. The April 3d Bill is repugnant to the Constitution and the laws of the United States and is unconstitutional on its face.

## STATEMENT OF FACTS

The relevant facts summarized below are contained in the following declarations and the exhibits thereto: Goering Declaration, the Nnaemeka Declaration; the Winger Declaration, and the Lee Declaration. Unless otherwise indicated, citations to "Exh. __" refer to exhibits to the Goering Declaration.

**The Working Families Party**

The Working Families Party (the "WFP") was formed in 1998 by a coalition of citizen activists, civic leaders and labor unions. Nnaemeka Decl. ¶ 4. It gained official political party status by garnering more than the legally-required standard of 50,000 votes for Governor on its line in 1998. Nnaemeka Decl. ¶ 4. The WFP has requalified for party status in each of the gubernatorial elections since 1998. Nnaemeka Decl. ¶ 5. During its 22 years as a recognized political party, the WFP has run thousands of candidates for federal, state and local office. Nnaemeka Decl. ¶ 6. By

running on the WFP line, candidates signal their alignment with the WFP's commitments to a more open, democratic and egalitarian society. Prominent among those commitments is the WFP's support for a system of public financing of elections. <u>Nnaemeka Decl.</u> ¶ 6, 10.

**Conflict between the NYS Democratic Party and the NYS WFP**

In its first 15 years of life as a recognized, ballot-qualified political party, the WFP developed a reputation as a competent electoral and lobbying force. The WFP in essence supplanted the Liberal Party as the state's most important "third" party on the left (the Conservative Party plays this role on the right), and its stature with voters has steadily grown. Working with legislative allies who it helped elect in Democrat-Working Families "fusion" candidacies, the WFP helped win legislative enactment of several progressive priorities, such as an increase in the minimum wage (2004), the Millionaires Tax (2009), reform of the Rockefeller Drug Laws (2009), and Paid Sick Leave (2013).

By 2014, even as the WFP's relationships with individual legislators in Albany remained strong, such was not the case with the Executive Branch. There was widespread dissatisfaction within the WFP with what some WFP members perceived as Governor Cuomo's shift to the right on fiscal policy, and his alliance with a rogue group of Democratic Senators who threw their support behind the Republican Senate Leader enabling Republicans to retain control of the New York State Senate. A tremendous battle ensued inside the WFP as to its 2014 nominee for Governor. A little-known law professor, Zephyr Teachout, emerged as a challenger to Cuomo for the WFP and Democratic Party nominations.

At the WFP Convention in June 2014, Governor Cuomo won the WFP nomination by a very small margin, and did so only after making important public pledges to support the party's program on wages, decarceration, public financing of elections, and other critical topics. Ms.

Teachout went on to challenge him in the Democratic Primary, and even though the WFP did not support her in that challenge, the Governor nevertheless held the WFP responsible for her emergence as a rival.

In 2018, the strained relationship between the Governor and the WFP reached a breaking point when actress and activist Cynthia Nixon decided to challenge Governor Cuomo for the nominations of both the Democratic and Working Families Parties. The Governor subsequently withdrew from consideration by the Working Families Party, which nominated Ms. Nixon in June, 2018 In the  September Democratic primary contest, Governor Cuomo won decisively, and the WFP chose not to continue with a doomed Nixon candidacy in the November general election. Ms. Nixon withdrew her name from the general election ballot, after which  the Working Families Party shifted its support to Governor Cuomo who won his third term by a substantial margin.

Despite its eventual support for the Governor's re-election, a bridge had been burned. The leaders of the New York State Democratic Party turned against the WFP.

 On March 4, 2019, the New York Democratic State Committee, under the leadership of the Democratic  Party Chair, Jay Jacobs, passed a resolution calling for an end to fusion voting. Nnaemeka Decl. ¶ 7; (*see* March 5, 2019 New York Times: "Ocasio-Cortez, Warren, Sanders in an unlikely skirmish with NY Democrats"). Fusion voting, which has been a part of New York's electoral system since the 1850's, allows a candidate to run for office as the nominee of more than one party in the same election. Nnaemeka Decl. ¶¶ 6, 8.

**The Commission and The New Election Law**

Shortly after the New York Democratic State Committee's 2019 resolution calling for the repeal of fusion voting, the legislature enacted, and Governor Cuomo signed into law, a bill creating the New York State Public Finance Commission. (the "Commission"). The Commission

was directed to "make recommendations for new laws" establishing a system of voluntary public financing for statewide and state legislative offices, and to make recommendations for "rules and definitions governing...political party qualifications." Nnaemeka Decl., Exh. B, p. 6, 48, 49, 54, 138. The statute also stated that "the Commission may report recommendations supported by a majority, each recommendation made to implement a determination pursuant to this act shall have the force of law…" *Id*. at 140. The Commission was required to issue its report by December 1, 2019, and its recommendations were to become binding Law on December 23, 2019, unless modified by the legislature. Under its enabling statute, ONLY the Commission's "recommendations" were to "have the force of law." Goering Decl., Exh. 1.

The WFP and its allies were concerned that the Commission would use its power to weaken or destroy the WFP and other minor parties by eliminating fusion voting. Nnaemeka Decl. ¶ 12. This concern was  amplified when Governor Cuomo appointed Democratic Party State Chair Jay Jacobs to  the Commission. As noted above, Jacobs was a vocal opponent of fusion voting. *See*  https://www.politico.com/states/new-york/albany/story/2019/10/25/Cuomo-quietlypresses-to-weaken-his-working-families-party-nemesis-1225974 (seven unnamed people reporting that the Governor or his top staff said that Governor Cuomo "wants to destroy the party."). *See, e.g.*, Carl Campanile, Cuomo Panel Moves Closer to Keeping Working Families off the Ballot.

Representatives of the  WFP and a wide variety of public interest groups, public officials and concerned citizens testified at the Commission's public hearings in support of a system of public campaign financing similar to the system that had operated in New York City elections for decades, but  against any change to New York's system of fusion voting.

When the Commission issued its  Recommendations on December 1, 2019, it avoided the "hot" issue of fusion voting. Nnaemeka Decl. ¶ 13. Instead, the Commission issued a

recommendation – which became law three weeks later – to drastically increase the requirements for a minor party to attain and then maintain its party status and ballot line in New York. It increased the number of votes a minor party must receive in each Gubernatorial election from 50,000 votes to 130,000 votes or 2% of the total votes cast, whichever is greater. Nnaemeka Decl., Exh. B at 5. The Commission also added a brand-new requirement that minor parties receive 130,000 votes in each Presidential election, or 2% of the total votes cast, whichever is greater. Significantly, the Commission's recommendations included neither a severability clause, nor a non-severability clause. Goering Decl., Exh 2.

The sole justification offered by the Commission for imposing these severe burdens on minor parties was an assertion in its December 1, 2019 Report that reducing the number of minor parties was necessary to insure the financial viability of the proposed system of public campaign financing. Nnaemeka Decl. ¶ 14. This assertion is demonstrably false.

Shortly after the Commission's Recommendations became law, both the Brennan Center for Justice and the Campaign Finance Institute issued reports conclusively demonstrating that the presence of minor parties would have a trivial financial impact on New York State's new system of public campaign financing. Lee Decl., Exh. A, pp. 3-5. The Brennan Center's report analyzed data from both Connecticut and New York City – the only jurisdictions in the United States that have both systems of public campaign financing and fusion voting essentially the same as the system set forth in the Commission's Recommendations – and concluded that: "in these places over multiple recent election cycles. minor party and independent candidates have generated minimal public financing costs, even when significant numbers were able to run for office." Lee Decl., Exh. A, p. 3. The data supporting the Brennan center's conclusions was all publicly available to the Commission and its staff. At its public hearings, numerous witnesses referenced

both the New York and Connecticut campaign finance systems. The Commission simply chose to ignore this inconvenient evidence.

The Commission's report also includes this unusual sentence: "Additionally, we believe that increasing party threshold will actually increase voter participation and voter choice since voters will now be less confused by complicated ballots with multiple lines for parties that may not have any unique ideological stances." Nnaemeka Decl, Exh. B, pp. 14-15. No evidence of any purported voter confusion is cited, and the assertion that wiping out New York's minor parties will somehow increase voter choice is absurd. As set forth in exhibit D to the Nnaemeka Declaration, approximately 10% of New York's voters cast their ballots on minor party lines. Eliminating all or most of the state's minor parties will clearly decrease voter choice. Nnaemeka Decl., Exh. D.

**The FY 2021 Budget Bill**

The WFP sued to invalidate the Commission's Recommendations, which acquired the force of law on December 23, 2019.  On March 12, 2020, the new law was struck down by the honorable Ralph A. Boniello III of the NYS Supreme Court. Justice Boniello issued a decision and order holding that the statute empowering the Commission to issue recommendations that had "the force of law" was an unconstitutional delegation of the legislature's unique power to enact laws. Goering Decl., Exh. 4.

Two weeks later, March 26, 2020, the WFP learned that, in negotiations over the FY 2021 budget, Governor Cuomo had proposed inserting the Commission's now defunct Recommendations into a complex 270-page budget bill. Nnaemeka Decl. ¶ 18. As the legislature was required to pass the fiscal year 2021 budget by April 1st, this was truly a last-minute addition. With neither chamber of the legislature able to physically meet in party conference or in full

session due to the pandemic, there was essentially no opportunity to debate or discuss this late addition to the budget. The legislature voted to pass the April 3d Bill, including Part zzz, which included the provisions for public financing of elections and the increased burdens on minor parties. it was signed into law by the Governor on April 3, 2020.

The April 3d Bill differed from the Commission's recommendations in several ways. Most significantly, while the Commission's recommendations included both provisions for a public campaign finance system and provisions imposing dramatic new requirements for minor parties, the recommendations included neither a severability nor a non-severability clause, the FY 2021 budget bill included BOTH a severability and a non-severability clause. Upon information and belief, members of the legislature were not informed of this important change before voting on the bill.

In fact, the April3d Bill does not even mention the idea that severe burdens on minor parties were necessary to insure the financial stability of the new system of public campaign financing. Furthermore, the Commission included a sentence in its recommendations concerning the new burdens to be placed on minor parties stating: "To establish a system of public financing of elections and ensure the financial stability of that system, the Commission further recommends." This sentence was deleted when the April 3d Bill was drafted. Thus, there is not a single sentence in this legislation to justify the presence of a non-severability clause.

As the Winger Declaration makes clear, New York's new election requirements place it near the extreme end of the ballot-access requirements of the 50 states. Winger Decl, ¶ 5. New York's combination of a high threshold in but one specified election (not *any* statewide race, as is common) and an every-two-year requirement is among the most severe ballot access regimes in the nation.

Had the newly established rules been in effect in 1998, the WFP would never have made it onto the ballot. In fact, only one of the eight parties formed in the last 20 years would exist today. Nnaemeka Decl. ¶ 22. The seven others each failed to cross the 2%, or the 130,000 vote threshold when they first sought to gain ballot status. Because they were formed under less onerous rules, they have played a vigorous part in many important political debates in the state.

Not only will the new rules enacted in the April 3d Bill prevent new parties from being born, the data suggests that these rules will, in fact, kill off nearly all parties that are currently qualified. Winger Decl, ¶ 6. In New York's most recent gubernatorial election in 2018, eight minor parties were on the ballot, only one of which would have met the new vote threshold. The burden of marshalling resources to meet the new standard is amplified by the fact that minor parties were given only 7 months' notice of their need to run a Presidential campaign to maintain "party" status in the middle of a pandemic.

It is up to this Court to strike down the unfair and unnecessary new burdens placed on existing or yet-to-be formed minor parties by the April 3d Bill. The Court should do so while severing these provisions from the laudable system of public campaign financing also enacted in that legislation.

## **ARGUMENT**

**I.     THIS COURT SHOULD ENJOIN THE APPLICATION OF NY ELECTION LAW SECTION 2-114 AND RESTORE THE PARTY AND CANDIDATE QUALIFICATION THRESHOLDS TO THEIR PRIOR LEVELS**

### **A.  STANDARDS FOR INJUNCTIVE RELIEF**

A preliminary injunction sought against government action taken pursuant to a statute or regulatory scheme requires that "the moving party . . . demonstrate (1) irreparable harm absent injunctive relief, (2) a likelihood of success on the merits, and (3) public interest weighing in favor of granting the injunction." *Friends of the E. Hampton Airport, Inc. v. Town of E. Hampton*, 841

F.3d 133, 143 (2d Cir. 2016). Moreover, the movant must show that "the balance of equities tips in his [or her] favor." *Winter v. Nat. Res. Def. Council, Inc.*, 555 U.S. 7, 20 (2008). "A showing of irreparable harm is the single most important prerequisite for the issuance of a preliminary injunction." *Faiveley Transp. Malmo AB v. Wabtec Corp.*, 559 F.3d 110, 118 (2d Cir. 2009) (internal quotation marks and citation omitted).

Where a moving party seeks a mandatory preliminary injunction requiring a change to the status quo, as opposed to a prohibitory preliminary injunction that merely maintains the status quo, the district court "may enter a mandatory preliminary injunction against the government only if it determines that, in addition to demonstrating irreparable harm, the moving party has shown a 'clear' or 'substantial' likelihood of success on the merits." *Thomas v. New York City Bd. of Elections*, 898 F. Supp. 2d 594, 597 (S.D.N.Y. 2012) (quoting *Mastrovincenzo v. City of New York*, 435 F.3d 78, 89 (2d Cir. 2006) (internal quotation marks omitted)). This standard also applies where the injunction "will provide the movant with substantially all the relief sought and that relief cannot be undone even if the defendant prevails at a trial on the merits." *People Ex. rel. Schneiderman v. Actavis PLC*, 787 F.3d 638, 650 (2d Cir. 2015) (internal quotation marks and citation omitted). Since Plaintiffs here meet the more rigorous standard, the Court need not decide whether a prohibitory or mandatory injunction is sought here. *See Green Party of New York State v. New York State Bd. of Elections*, 267 F. Supp. 2d 342, 351 (E.D.N.Y. 2003), modified, No. 02 Civ. 6465, 2003 WL 22170603 (E.D.N.Y. Sept. 18, 2003), and *aff'd*, 389 F.3d 411 (2d Cir. 2004). *See No Spray Coal., Inc. v. City of New York*, 252 F.3d 148, 150 (2d Cir. 2001).

As explained in more detail below, the substantive legal theories here are meritorious and the challenged statute is plainly unconstitutional. "No right is more precious in a free country than that of having a voice in the election of those who make the laws … The right to vote remains, at

bottom, a federally protected right … The federal protections of the right to vote also include those against interference from the states." *Rossito-Canty v. Cuomo*, 86 F. Supp. 3d 175, 180-181 (E.D.N.Y. 2015) (quotation marks and citations omitted). "The right to vote freely for the candidate of one's choice is of the essence of a democratic society, and any restrictions on that right strike at the heart of representative government." *Harman v. Forssenius*, 380 U.S. 528, 537 (1965). There no genuine factual disputes.

## B.  PLAINTIFFS HAVE SUFFERED AND ARE SUFFERING IRREPARABLE HARM

To establish irreparable harm, Plaintiffs "must demonstrate that absent a preliminary injunction they will suffer an injury that is neither remote nor speculative, but actual and imminent, and one that cannot be remedied if a court waits until the end of trial to resolve the harm." *Faiveley*, 559 F.3d at 118 (internal quotation marks and citation omitted).

Plaintiffs have shown irreparable injury because they are incurring a continuing violation of their constitutional rights. "All election laws necessarily implicate the First and Fourteenth Amendments." *Gonsalves v. New York State Bd. of Elections*, 974 F. Supp. 2d 191, 197 (E.D.N.Y. 2013) (internal quotation marks and citation omitted). And where a challenged regulation "governs the registration and qualification of voters, the selection and eligibility of candidates, or the voting process itself, [it] inevitably affects—at least to some degree—the individual's right to vote and his right to associate with others for political ends." *Price v. New York State Bd. of Elections*, 540 F.3d 101, 107–08 (2d Cir. 2008) (*quoting Anderson v. Celebrezze*, 460 U.S. 780, 788 (1983) (internal quotation marks omitted)).

In the Second Circuit, it is well-settled that an alleged constitutional violation constitutes irreparable harm. *See, e.g., Connecticut Dep't of Envtl. Prot. v. O.S.H.A.*, 356 F.3d 226, 231 (2d Cir. 2004) ("[W]e have held that the alleged violation of a constitutional right triggers a finding of

irreparable injury." (internal quotation marks and citations omitted)); *Statharos v. New York City Taxi & Limousine Comm'n*, 198 F.3d 317, 322 (2d Cir. 1999) ("Because plaintiffs allege a deprivation of a constitutional right, no separate showing of irreparable harm is necessary."); *Jolly v. Coughlin*, 76 F.3d 468, 482 (2d Cir. 1996) (clarifying that "it is the alleged violation of a constitutional right that triggers a finding of irreparable harm" and a substantial likelihood of success on the merits of a constitutional violation is not necessary). *See, e.g., Green Party of New York State*, 267 F. Supp. 2d at 351 ("The plaintiffs have satisfied the [irreparable harm] prong of the test by alleging" that certain aspects of New York's voter enrollment scheme violated "their First and Fourteenth Amendment rights to express their political beliefs, to associate with one another as a political party, and to equal protection of the law."); *Credico v. New York State Bd. Of Elections*, 751 F. Supp. 2d 417, 420 (E.D.N.Y. 2010) (finding irreparable injury where plaintiffs alleged that the [BOE's] refusal to place a candidate's name on the ballot violated plaintiffs' First and Fourteenth Amendment rights to "fully express their political association with the parties or candidates of their choice"); *Dillon v. New York State Bd. of Elections*, No. 05 Civ. 4766, 2005 WL 2847465, at *3 (E.D.N.Y. Oct. 31, 2005) (finding irreparable harm where "plaintiffs allege[d] violations of their First and Fourteenth Amendment rights of expression and association and equal protection of the law").

"All election laws necessarily implicate the First and Fourteenth Amendments." *See, e.g., Green Party of New York State*, 267 F. Supp. 2d at 351 ("The plaintiffs have satisfied the [irreparable harm] prong of the test by alleging" that certain aspects of New York's voter enrollment scheme violated "their First and Fourteenth Amendment rights to express their political beliefs, to associate with one another as a political party, and to equal protection of the law."); *Credico*, 751 F. Supp. 2d at 420 (E.D.N.Y. 2010) (finding irreparable injury where plaintiffs

alleged that the [BOE's] refusal to place a candidate's name on the ballot violated plaintiffs' First and Fourteenth Amendment rights to "fully express their political association with the parties or candidates of their choice"); *Dillon*, No. 05 Civ.4766, 2005 WL 2847465, at *3 (finding irreparable harm here" plaintiffs allege[d] violations of their First and Fourteenth Amendment rights of expression and association and equal protection of the law"). *See Amarasinghe v. Quinn*, 148 F. Supp. 2d 630, 634 (E.D. Va. 2001) ("It is clear theoretical, correlative effect on voters.").

 "'[T]iming is of the essence in politics and adelay of even a day or two may be intolerable.'" *N.Y. Progress & Prot. PAC v. Walsh*, 733F.3d 483, 486 (2d Cir. 2013) (quoting *Klein v. City of San Clemente*, 584 F.3d 1196, 1208(9th Cir. 2009)) (emphasis added). That is why "'[t]he loss of First Amendment freedoms, even for minimal periods of time, unquestionably constitutes irreparable injury.'" *Id.* (quoting *Elrod v. Burns*, 427 U.S. 347, 373 (1976)).

## C. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS

### 1. ELECTION LAW SECTION 2-114 IS FACIALLY INVALID BECAUSE IT SEVERELY RESTRICTS PLAINTIFFS' FIRST AMENDMENT RIGHTS OF ASSOCIATION AND SPEECH

Although "administration of the electoral process is a matter that the Constitution largely entrusts to the States," the Supreme Court has long recognized that "unduly restrictive state election laws may so impinge upon freedom of association as to run afoul of the First and Fourteenth Amendments." *Kusper v. Pontikes*, 414 U.S. 51, 57 (1973). Ballot access rules implicate "two different, although overlapping, kinds of rights—the right of individuals to associate for the advancement of political beliefs, and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively." *Williams v. Rhodes*, 393 U.S. 23, 30 (1968); *see Bullock v. Carter*, 405 U.S. 134, 143 (1972) ("[T]he rights of voters and the rights of candidates do not lend themselves to neat separation; laws that affect candidates always have at

least some theoretical, correlative effect on voters."). "[N]o litmus-paper test will separate valid ballot access provisions from invalid interactive speech restrictions . . . [b]ut the First Amendment requires [courts] to be vigilant in making those judgments, to guard against undue hindrances to political conversations and the exchange of ideas." *Buckley v. Am. Constitutional Law Found., Inc.*, 525 U.S. 182, 192 (1999) (internal quotation marks and citations omitted). *Rockefeller v. Powers* (Rockefeller II), 78 F.3d 44, 45 (2d Cir. 1996) (affirming district court order reducing number of signatures required to appear on presidential primary ballot). Voters "have an associational right to vote in political party elections, and that right is burdened when the state makes it more difficult for these voters to cast ballots." *Price*, 540 F.3d at 108 (citations omitted).

**The *Anderson-Burdick* Framework**

In assessing challenges to ballot-access restrictions under the First and Fourteenth Amendments, courts apply the so-called Anderson-Burdick balancing test, derived from two Supreme Court cases. In *Anderson v. Celebrezze*, the Supreme Court struck down as unconstitutional an Ohio law providing that independent candidates could appear on the presidential general election ballot only if they met the filing requirement by March of the election year. 460 U.S. at 805–06. The Court held that when confronted with a restriction on ballot access, a court must "first consider the character and magnitude of the asserted injury to the rights protected by the First and Fourteenth Amendments that the plaintiff seeks to vindicate," then "identify and evaluate the precise interests put forward by the State as justifications for the burden imposed by its rule," and then "determine the legitimacy and strength of each of those interests" and "consider the extent to which those interests make it necessary to burden the plaintiff's rights." *Id.* at 789.

14

In *Burdick v. Takushi*, the Supreme Court applied that test to uphold Hawaii's prohibition on write-in voting in general elections. 504 U.S. 428, 441–42 (1992). In doing so, the Court refined the Anderson standard, explaining that "the rigorousness of [a court's] inquiry into the propriety of a state election law depends upon the extent to which a challenged regulation burdens First and Fourteenth Amendment rights." *Id.* at 434. "[W]hen those rights are subjected to 'severe' restrictions, the regulation must be 'narrowly drawn to advance a state interest of compelling importance'"—in other words, the restriction must survive the standard commonly referred to as "strict scrutiny." *Id.* (citation omitted). "But when a state election law provision imposes only reasonable, nondiscriminatory restrictions upon the First and Fourteenth Amendment rights of voters, the State's important regulatory interests are generally sufficient to justify the restrictions." Id. (internal quotation marks and citation omitted). If a restriction is not "severe," then "the State's reasonable and nondiscriminatory restrictions will generally be sufficient to uphold the statute if they serve important state interests." *Price*, 540 F.3d at 109. There must, however, be a "reasonable fit" between the governmental interest and the means used to further it.  *Id.*

In sum, therefore, this Court must first examine the extent to which the April 2 budget  law qualify as "severe" or "reasonable, nondiscriminatory" restrictions, and second, consider the legitimacy and strength of the rationale put forward by Defendants, and determine whether it justifies the extent of the burden on Plaintiffs' rights under the applicable framework.

"Laws restricting a party's ballot access thus burden two rights: 'the right of individuals to associate for the advancement of political beliefs and the right of qualified voters, regardless of their political persuasion, to cast their votes effectively.'" *Libertarian Party of Ill. v. Scholz*, 872 F.3d 518, 523 (7th Cir. 2017) (quoting *Williams v. Rhodes*, 393 U.S. 23, 30 (1968)). The Supreme Court has held unconstitutional laws that interfere with political parties' "choice of leaders." *Eu v.*

*S.F. Cty. Democratic Cent. Comm.*, 489 U.S. 214, 230, 233 (1989). The Seventh Circuit confronted this issue in *Scholz*, where Illinois required a new political party seeking to run a candidate to also run "a full slate of candidates, one for each race in the relevant political subdivision," even if some of them were races the party "may want no part of." *Scholz*, 872 F.3d at 521. The court found the burden of recruiting candidates for unwanted races and devoting "the funding and other resources necessary to operate a full-fledged campaign" was severe. *Id.* at 524. The Supreme Court has explained that "no heavier burden on a political party's associational freedom" exists than where "forced association has the likely outcome" of "changing the parties' message." *Cal. Democratic Party v. Jones*, 530 U.S. 570, 582-583 (2000). Although WFP has run candidates in five prior presidential elections, it has not generated sufficient votes in a majority of those elections to qualify under the new rules.

The  April 3 law did not provide a reason for the new ballot access laws.  The Supreme Court recognizes "the constitutional right of citizens to create and develop new political parties." *Norman v. Reed*, 502 U.S. 279, 288 (1992). "The right derives from the First and Fourteenth Amendments and advances the constitutional interest of like-minded voters to gather in pursuit of common political ends, thus enlarging the opportunities of all voters to express their own political preferences." *Id.* "This First Amendment freedom to gather in association for the purpose of advancing shared beliefs is protected by the Fourteenth Amendment from infringement by any State." *Democratic Party of U.S. v. Wisconsin ex rel. La Follette*, 450 U.S. 107, 121 (1981). And because "ballot access restrictions" can "'limit the field of candidates from which voters might choose,'" *Anderson*, 460 U.S. at 786, courts subject to strict scrutiny those ballot access restrictions that impose a severe burden on political parties and candidates.

"A burden that falls unequally on new or small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment." *Anderson*, 460 U.S. at 793. Even if the Working Families Party wanted to run a candidate for President, the short timeframe of the new law would disproportionately harm WFP and other small political parties, affording insufficient time to build the momentum and recognition needed to garner 2% of the vote (or 130,000 votes) for President in November of this year.

The budget bill contains extensive legislative findings regarding the need for and value of a public campaign finance system. Conspicuously absent, however, is any mention or justification of the new requirements. The requirement under preexisting law that a "party" obtain 50,000 votes in a Gubernatorial election already separated out  minor purported "parties." As the Second Circuit has already explained, any party that can place a statewide candidate on the ballot has "demonstrated a 'modicum of support' sufficient to overcome the state's broad latitude in controlling frivolous party registration of tiny fractional interests." *Green Party of N.Y. State*, 389 F.3d at 422 (*quoting Baer v. Meyer*, 728 F.2d 471, 476 (10th Cir. 1984)). The New requirements is thus not appropriately tailored to the State's asserted interest. The Working Families Party of New York will have to meet the requalification requirements during the 2022 Gubernatorial election. Those qualifications have been increased to the greater of 130,000 votes or 2% of the vote. There is no valid justification for requiring the Working Families Party and others to satisfy that requirement and to do so in a presidential election scheduled I just six months.  In imposing that requirement, the new ballot-access laws violate the First and Fourteenth Amendments as applied to the Working Families Party and all other existing and potential third parties.

Ballot-access requirements affect smaller political parties differently than larger ones. They are particularly burdensome for new parties seeking to gain political influence. The Constitution

recognizes that "[n]ew parties struggling for their place must have the time and opportunity to organize in order to meet reasonable requirements for ballot position, just as the old parties have had in the past." *Williams v. Rhodes*, 393 U.S. 23, 32 (1968). By requiring a political organization to nominate candidates for both President and Governor, to secure the greater of 2% of the vote or 130,000 votes for each such candidate on that organization's ballot line in order to be a recognized "party" under state law, and to secure that level of support in a Presidential election that will be held in only a few short months, the new ballot-access laws disproportionately impact and prejudice smaller and nascent political parties. The burden on these parties is severe, and utterly unjustified. They deprive Plaintiffs and others of the rights, privileges, and immunities secured to them by the Fourteenth Amendment of the United States Constitution, in violation of 28 U.S.C. § 1983.

### 2. THE BALLOT ACCESS REQUIREMENTS IN THE APRIL 3D LAW VIOLATE PLAINTIFFS' FOURTEENTH AMENDMENT RIGHTS TO EQUAL PROTECTION AND DUE PROCESS

Growth takes time, and minor parties must be protected as they grow. "Historically political figures outside the two major parties have been fertile sources of new ideas and new programs; many of their challenges to the status quo have in time made their way into the political mainstream." *Anderson*, 460 U.S. at 794. And the voters' "right to vote is 'heavily burdened' if that vote may be cast only for major-party candidates at a time when other parties or other candidates are 'clamoring for a place on the ballot.'" *Id.* at 787 (quoting *Williams*, 393 U.S. at 31). Minor political parties have Fourteenth Amendment Equal Protection rights precisely because of their size and newness. The "grossest discrimination can lie in treating things that are different as though they were exactly alike.'" *Green Party of Tenn. v. Hargett*, 791 F.3d 684, 694 (6th Cir. 2015) (quoting *Jenness v. Fortson*, 403 U.S. 431, 441-42 (1971)); *see also Anderson*, 460 U.S. at

793, 801 ("A burden that falls unequally on newer small political parties or on independent candidates impinges, by its very nature, on associational choices protected by the First Amendment."). Unequally burdening small parties discriminates against "those voters whose political preferences lie outside the existing political parties." *Anderson*, 460 U.S at 794. Because the "right to form a party for the advancement of political goals means little if a party can be kept off the election ballot and thus denied an equal opportunity to win votes," *Williams* 393 U.S. at 31, what is needed is a "real and essentially equal opportunity for ballot qualification" by small parties. *Green Party of Tenn.*, 791 F.3d at 695 (internal quotations omitted). The burden on WFP is unequal to the burden imposed on the Republican and Democratic Parties. *See* Winger Decl. ¶¶ 26-27, 33-35.

Finally, a word about the timing of these new requirements.  By changing the requirements for retaining "party" status just six months before the Presidential election., New York's Election Law violates the Fourteenth Amendment's Equal Protection and Due Process Clauses.  In effect, the new law operates retroactively, because, if WFP and other parties had been subject to it two years ago, they would have been actively engaged in raising federal contributions and spending those dollars to increase their chances of preserving their party qualification and ballot access for the 2022 elections.  This is just the sort of severe burden which justified the court to grant an injunction on strikingly similar facts in *Libertarian Party of Ohio v. Husted*, 2014 WL 11515569 (S.D. Ohio January 1, 2014).

### 3.   THE BALLOT ACCESS REQUIREMENTS IN THE APRIL 3D LAW CANNOT SURVIVE STRICT SCRUTINY

Because the new ballot access requirements impose a severe burden on First and Fourteenth Amendment rights of WFP and its members, it must pass "strict scrutiny." *Price*, 540 F.3d at 109. That is, it "has to be narrowly drawn to advance a compelling state interest." *Green*

*Party of N.Y. State*, 389 F.3d at 419. The State bears the burden of proving the relevant state interest, whether that interest is compelling, and the narrowness of tailoring to advance that interest. *See Id.* at 419-20; *accord, e.g., Lerman v. Bd. of Elections in City of NY*, 232 F.3d 135, 153 (2d Cir. 2000); *Free Libertarian Party, Inc. v. Spano*, 314 F. Supp. 3d 444, 459 (E.D.N.Y. 2018); *see* generally, *e.g., Williams-Yulee v. Fla. Bar*, 575 U.S. 433, 444 (2015) ("We have emphasized that it is the rare case in which a State demonstrates that a speech restriction is narrowly tailored to serve a compelling interest.") (internal quotations omitted); *Perry v. Schwarzenegger*, 704 F. Supp. 2d 921, 995 (N.D. Cal. 2010) (state bears burden of showing law "is narrowly tailored to a compelling government interest.").

In conducting this inquiry, courts recognize that minor parties often have less political clout: "[B]ecause the interests of minor parties and independent candidates are not well represented in state legislatures, the risk that the First Amendment rights of those groups will be ignored in legislative decision making may warrant more careful judicial scrutiny. *Anderson*, 460 U.S. at 793 n.16. State regulation of Federal elections warrants scrutiny as well, because a State's requirements may have nationwide effects and because the State's own interests are attenuated. *Id.* at 794-95.

a. **THE BALLOT ACCESS REQUIREMENTS IN THE APRIL 3D LAW HAVE NO CONNECTION TO A COMPELLING STATE INTEREST**

The State has never justified the new requirements. The Legislature appears not to have debated or discussed it. While the section of the FY 2021 Budget enacting the public-finance system contained a section entitled "Legislative findings and intent," nothing in that section (or anywhere) purported to justify the new party qualification requirements. *See* Exh. 5 at 244-45 (§ 14-200). To the contrary, the Legislature stressed the importance of "encourag[ing] qualified candidates to run for office." *Id.* at 244-245. The only discussion of a motivation for heightening ballot-access thresholds comes from the Report of the now-invalidated Commission. Assuming—

without obvious basis — that the Commission's rationales can substitute for the legislative intent, those rationales only confirm that the new requirements are unconstitutional. The Report stated that limiting the number of minor political parties was necessary to keep the cost of the new public campaign-finance program under $100 million annually. *See* Exh. 3 at 14. It stressed the need for "a demonstration of credible levels of support from voters." *Id*. None of that, however, justifies new requirements. For years, New York has conditioned "party" status on securing credible levels of support in the Gubernatorial election, but the Gubernatorial threshold itself has now been raised from 50,000 votes to the greater of 2% of the votes cast or 130,000 votes. *See* Exh. 5 at 259; N.Y. Elec. Law § 1-104(3). There is no conceivable connection between the $100 million goal for 2022-2023 and the new requirements.

The underlying assumption—that minor-party political candidates sap public campaign-finance funds—is itself unjustifiable. Independent reports by the Brennan Center For Justice and the Campaign Finance Institute rebut that premise. *See generally* <u>Lee Decl.</u>, Exh A. ("the new ballot-access laws "logically unjustified and potentially unconstitutional.") It noted that the Commission offered "no evidence that tougher ballot access was important to save public financing costs," and concluded that "[n]othing in the experience of longstanding public financing programs provides a reasonable basis for this belief." *Id.* at 1. Indeed, the <u>Lee Decl.</u> suggests that this concern is neither "real" nor "logical," and that "raising ballot thresholds to contain minor party public financing costs" is "senseless[]." *Id*. at 3,6. Rather, the experiences of "two of the nation's most well-established public financing programs"—New York City and Connecticut— show that "minor party and independent candidates have generated minimal public financing costs, even when significant numbers were able to run for office." *See* Exh. 6 at 3. To participate in New York's public campaign finance system a candidate must first raise a threshold amount of private

funds. *See* Exh. 5 at 247-49 (§14-203). Minor-party candidates essentially never do. The Brennan Center found that the Commission's cost concerns were "divorced from the reality of" minor-party candidates' "fundraising record in New York State and their participation rates in existing public financing programs." *See* Exh. 6 at 7; *see also* <u>Winger Decl.</u>, Exh. 9 at 32. The desire to constrain the costs of public funding in State elections beginning in 2024 is not furthered by the new requirements.

### b.   THE BALLOT ACCESS REQUIREMENTS IN THE APRIL 3D LAW ARE NOT NARROWLY TAILORED

The new ballot access requirements would not withstand strict scrutiny even if they furthered a State interest in preserving the $100 million annual budget goal on public campaign funds, because there are less burdensome means available. "Precision of regulation must be the touchstone in an area closely touching our most precious freedoms. If the State has open to it a less drastic way of satisfying its legitimate interests, it may not choose a legislative scheme that broadly stifles the exercise of fundamental personal liberties." *Anderson*, 460 U.S. at 806 (internal quotations omitted).

The private-fundraising prerequisites for obtaining public financing will keep the costs of the public finance system well below the spending goal without the new requirements. A candidate for Governor must raise $500,000 from at least 5,000 donors before qualifying for public funding. An Assembly candidate must raise $4,000 to $6,000 entirely from in-district donations from at least 75 donors, and a Senate candidate must raise $8,000 to $12,000 entirely from in-district donations from at least 150 donors. *See* Exh. 5 at 248-49; Exh. 6 at 5; <u>Winger Decl.</u>, Exh. 9 at 13.

The Brennan Center found that in New York "not a single minor party candidate for a statewide office in 2018 or 2014 would have met the private fundraising prerequisites to qualify for the new state program." <u>Lee Decl.</u> Exh. A at 5; <u>Winger Decl.</u> ¶ 30. And CFI found that only

one Assembly candidate "would have come close." Winger Decl., Exh. 9 at 32. Candidates from SAM, the Green Party, and the Libertarian Party would be subject to that $5,000 cap in every legislative district in New York, the Working Families Party candidates would be subject to that cap in every Assembly district and 56 of 63 Senate districts, and Conservative Party candidates would be subject to that cap in 76 Assembly districts and 20 Senate districts. *See* Exh. 6 at 8. As a result of these inherent limitations on minor-party candidates—the requirement to first raise substantial private funds from a large number of donors, and the$5,000 cap in small primaries— minor parties will not make a meaningful impact on the New York State public financing program. The tie between these requirements and the overall cap is far closer than any tether to the Presidential election. In the face of these structural limitations, the Brennan Center noted the "senselessness of raising ballot thresholds to contain minor party public financing costs." *Id.* (emphasis added).

Even if the ballot-access thresholds for "party" qualification were a reasonable proxy for a candidate's fundraising legitimacy, the Second Circuit already held that 50,000 votes in a Gubernatorial election demonstrated the "modicum of support sufficient to overcome the state's broad latitude in controlling frivolous party registration of tiny fractional interests." *Green Party of N.Y. State*, 389 F.3d at 422 (internal citations omitted). Political parties have tried to surmount the 50,000 vote threshold for years, and many have failed, or narrowly succeeded and then failed in a subsequent election. Winger Decl. ¶¶ 6,20-25. Having more than doubled that requirement for the Gubernatorial election—to the greater of 2% of the vote or 130,000 votes—the need to suppress minor political parties provides even less justification for the new requirements. Because the State has not "use[d] the least restrictive means to achieve its ends," the new requirements fail strict scrutiny. *Evergreen Ass'n, Inc. v. City of N.Y.*, 740 F.3d 233, 246 (2d. Cir. 2014).

### 4.   THE BALLOT ACCESS REQUIREMENTS IN THE APRIL 3D LAW WOULD NOT SURVIVE EVEN A LOWER LEVEL OF SCRUTINY

If the Court were to conclude that the burden of the new requirements is not "severe," the Court would have to assess whether the State's interest is "sufficiently weighty to justify the limitation imposed on the party's rights," *Timmons v, Twin Cities Area New Party*, 520 U.S. 351, 363-364 (1997) (internal citations omitted),which is the standard that applies where a burden on rights is somewhere between "trivial" and "severe." The new requirements would not survive this lower standard either.  In that analysis, "the court must actually 'weigh' the burdens imposed on the plaintiff against 'the precise interests put forward by the State,' and the court must 'take into consideration the extent to which those interests make it necessary to burden the plaintiff's rights.'" *Price*, 540 F.3d at 108-109 (quoting *Burdick*, 504 U.S. at 434). This is not "rational basis"  review, in which a plaintiff "must negative every conceivable basis which might support the challenged law, even if some of those bases have absolutely no foundation in the record." *Id.* at 109 (internal citations and quotation marks omitted). Instead, the Court assesses only the "substantive justifications for the restrictions" that the State actually "put forward." Id. at 110.Here, the State has never put forward a justification for the requirements. And the Commission's only asserted basis for all of the ballot-access changes—to maintain the $100 million public campaign finance budget after the 2022 election—lacks any connection to the new requirements, as set forth above.

### D.  THE BALANCE OF EQUITIES FAVORS INJUNCTIVE RELIEF

The equities also favor WFP, which seeks to do no more than preserve the status quo as it existed before the New requirements were enacted on April 3, 2020.  WFP secured "party" status

that would have lasted until the 2022 Gubernatorial election and here seeks relief that would put it in that same position. The Defendants have identified no hardship that would befall them if things remain as they were. And given that the only shred of reason for the increased ballot-access thresholds is protecting a public campaign finance system that will not start until after the 2022 election, there is no hardship to Defendants at all.

The equities tip strongly in Plaintiffs' favor for the reasons already discussed. In assessing the balance of equities, "the court must 'balance the competing claims of injury and must consider the effect on each party of the granting or withholding of the requested relief,' as well as 'the public consequences in employing the extraordinary remedy of injunction.'" *Make the Rd. New York v. Cuccinelli*, 419 F. Supp. 3d 647, 665 (S.D.N.Y. 2019) (*quoting Winter v. National Resources Defense Council Inc.*, 555 U.S. 7, 24 (2008).

### E.  AN INJUNCTION WILL SERVE THE PUBLIC INTEREST

The public interest will be served by allowing WFP and other minor parties to retain their "party" status.  Allowing WFP to retain that "party" status serves the public interest in every respect. "[S]ecuring First Amendment rights is in the public interest." *New York Progress & Prot. PAC*, 733 F.3d at 488. *See Hirschfeld v. Bd. Of Elections in N.Y.C*, 984 F.2d 35, 39 (2d Cir. 1993).

### II.    THE UNCONSTITUTIONAL BALLOT ACCESS PROVISIONS SHOULD BE SEVERED FROM THE CAMPAIGN FINANCE PROVISIONS

As noted previously, the party qualification provisions of the new law went into effect on April 3, 2020, but the campaign finance provisions do not go into effect until November 2022, Although the Court could perhaps temporarily enjoin only the ballot access requirement applicable to this year's presidential election without addressing whether such a ruling would invalidate the entirety of the new election law, Plaintiffs urge the Court to rule now on the question of severability of the party qualification standards from the campaign finance provisions of the new law. The

Working Families Party has a strong interest in severing the ballot access requirements. For the reasons set forth here, those provisions should be severed to preserve the campaign finance law which was the main and only legitimate reason for this law in the first place.

On December 23, 2019, the prior incarnation of this bill became law when the Commission's recommendations entered into force. It should be stressed that only the Commission's recommendations, and not its statements or its findings, became part of the new law. The new law contained no statement as to severability or non-severability (except as to one severability provision not applicable here). After the law was invalidated on March 12, 2020, the drafters inserted an entirely new section at the very end of the bill:

> Severability. The component clauses, sentences, subdivisions, paragraphs, sections, and parts of this law shall be interpreted as being non-severable from the other components herein. If any clause, sentence, subdivision, paragraph, section or part of this act be adjudged by any court of competent jurisdiction to be invalid, such judgment shall invalidate the remainder thereof, and shall not be confined in its operation to the clause, sentence, subdivision, paragraph, section or part thereof directly involved in the controversy in which such judgment shall have been rendered.

Goering Decl., Exh. 5, pp. 259-260. The Bill, however, has the following contradictory boilerplate clause in the very next section:

> Severability clause. If any clause, sentence, paragraph, subdivision, section or part of this act shall be adjudged by any court of competent jurisdiction to be invalid, such judgement shall not affect, impair, or invalidate the remainder thereof, but shall be confined in its operation to the clause, sentence, paragraph, subdivision, section or part thereof directly involved in the controversy in which such judgement shall have been rendered. It is hereby declared to be the intent of the legislature that this act would have been enacted even if such invalid provisions has not been included herein.

Goering Decl., Exh. 5, p. 260.

The two provisions are totally contradictory. There is thus no "plain meaning" in the statute itself and there is no legislative history showing what the legislature may have intended. Thus, the

court should apply the general, weighty presumption in favor of severability and sever these provisions from the campaign finance provisions. The court must "presume that the unconstitutional application is severable." *United States v. Booker*, 543 U.S. 220, 323 (2005). The State cannot possibly bear its burden of showing that the legislature would not have enacted the campaign finance provisions without the new, invalid ballot access requirements. *Buckley v. Valeo*, 424 U.S. 1, 109 (1976) (citations omitted). This is especially so given the lack of any logical relationship between those requirements and the amount of campaign financing that the State would incur without them. *See, e.g.*, Winger Declaration ¶¶ 4-18. The Court should enforce the severability provision and hold that the ballot access requirements are severable from the rest of the law.

When a statute reveals a constitutional flaw, the Court ordinarily "limit[s] the solution [to] severing any problematic portions while leaving the remainder intact." *Free Enterprise Fund v. Public Company Accounting Oversight Bd.*, 561 U.S. 477, 508 (2010) (internal quotation marks omitted). The relevant question is whether the Legislature would have wanted unproblematic aspects of the legislation to survive or would want them to fall along with the infirmity. "Unless it is evident that the Legislature would not have enacted those provisions which are within its power, ... the invalid part may be dropped if what is left is fully operative as a law." *New York v. U.S.*, 505 U.S. 144, 186 (1992) (internal quotation marks omitted). Here, it is scarcely arguable that Congress "would have preferred no statute at all[.]" *Executive Benefits Ins. Agency v. Arkinson*, 573 U.S. 25, 37 (2014) (citations omitted).

We have not found a single case where a New York Court addressed a non-severability clause in a statute. Severability clauses like the one in the new April 3d here are common, but "[a] non-severability clause is almost unheard of and constitutes a legislative finding that every

section is so important to the single subject that no part of the act can be removed without destruction of the legislative purpose." *Farrior v. Sodexho, U.S.A.*, 953 F.Supp. 1301, 1302 (N.D.Ala.1997).  The unconstitutional ballot access requirements should be severed from the rest of the new law.

A severability determination of a state statute is a matter of state law. *Environmental Encapsulating Corp. v. City of New York*, 855 F.2d 48, 60 (2d. Cir. 1988). *See Doyle v. Suffolk County,* 786 F.2d 523, 526-27 (2d. Cir.), *cert. denied*, 479 U.S. 825 (1986). *Leavitt v Jane L.*, 518 U.S. 137 (1996), federal courts routinely predict what a state court would do. *See Brookins v O'Bannon*, 699 F2d 648, 650-51, 655 (3d Cir 1983) (looking beyond inseverability clause to legislative history before holding the statute inseverable); *Stiens v. Fire & Police Pension Ass'n*, 684 P.2d 180, 184 (Colo.1984) (holding that the legislature intended the benefit provisions of a pension Act to be severable from the Act's unconstitutional funding provisions, even though the Act had a non-severability provision); *Pennsylvania Fed'n of Teachers v. School Dist. of Philadelphia*, 506 Pa. 196, 202 (1984) (holding Act unconstitutional for persons who were members of retirement system at the time of the enactment, but finding Act constitutional as applied to those who became members of the retirement system subsequent to the effective date of the Act, even though the Act had a non-severability provision); *Louk v. Cormier*, 218 W.Va. 81 (2005) certain provisions of health care act are severable notwithstanding non severability clause).

 "It is a fundamental rule that an unconstitutional part of a statute may be severed and rejected, while the valid portion may stand." *Town of Islip v. Caviglia*, 141 A.D.2d 148 (2nd Dep't 1988). As formulated long ago by then Judge Cardozo, the rule in New York is as follows:

> The principle of division is not a principle of form. It is a principle of function. The question is in every case whether the legislature, if partial invalidity had been foreseen, would have wished the statute to be enforced with the valid part exscinded, or rejected altogether. The answer must be reached pragmatically, by

the exercise of good sense and sound judgment, by considering how the statutory
rule will function if the knife is laid to the branch instead of at the roots.

*People ex rel. Alpha Portland Cement Co. v. Knapp*, 230 N.Y. 48, 60 (1920), *cert. denied*, 256

U.S. 702 (1921). The answer depends on whether "the legislature, if partial invalidity had been

foreseen, would have wished the statute to be enforced with the invalid part exscinded, or rejected

altogether." *Id*.

Where it is possible to identify in the text of a statute particular language that is

unconstitutional, a court should attempt to strike only that language, provided that the remainder

of the statute can function effectively without the excised portion and that the resulting whole is

consistent with the intent and design of Congress. *State v. Alaska Democratic Party*, 426 P.3d 901

(Alaska 2018) (severance where party affiliation rule was not narrowly tailed to prevent voter

confusion, supporting finding that rule violated party's free association right). The question is

always" whether the challenged provisions may be severed, leaving the statute otherwise

operational." *Hynes v. Tomei*, 92 N.Y.2d 613 (1998). As a general rule, a court should refrain from

invalidating an entire statute when only portions of it are objectionable. *National Advertising Co.

v. Town of Niagara United States*, 942 F.2d 145 (2d. Cir. 1991). Destroying the campaign finance

system here is required only if "the valid and invalid provisions are so intertwined that excision of

the invalid provisions would leave a regulatory scheme that the legislature never intended. *New

York State Superfund Coal., Inc. v. New York State Dep't of Envt'l Conservation*, 75 N.Y.2d 88,

94 (1989). That is not the case here. The record shows that the party qualification provisions are

not remotely "intertwined" with the campaign finance scheme.

The Working Families Party has long supported robust governmental campaign finance

provisions. So has a majority of the New York legislature.  The Court should strike down the ballot

access requirements and sever them from the rest of the Election Law.

## RELIEF REQUESTED

The Court grants preliminary injunctions "to restore the status quo ante." *United States v. Adler's Creamery*, 107 F.2d 987, 990 (2d Cir. 1939 *United States v. Adler's Creamery*, 107 F.2d 987, 990 (2d Cir. 1939). "The purpose of an injunction [pending litigation] is to guard against a change in conditions which will hamper or prevent the granting of such relief as may be found proper after the trial of the issues. Its ordinary function is to preserve the status quo and it is to be issued only upon a showing that there would otherwise be danger of irreparable injury." *Id.*; *see also Asa v. Pictometry Intern. Corp.*, 757 F. Supp.2d 238, 243 (W.D.N.Y.2010) ("[T]he court's task when granting a preliminary injunction is generally to restore, and preserve, the status quo ante, i.e., the situation that existed between the parties immediately prior to the events that precipitated the dispute.").

Here, the status quo ante is the state of affairs immediately prior to the enactment of the April 3 law. "'Status quo' does not mean the situation existing at the moment the [lawsuit] is filed, but the 'last peaceable uncontested status existing between the parties before the dispute developed.'" *Chobani, LLC v. Dannon Co., Inc.*, 157 F. Supp. 3d 190, 201 (N.D.N.Y. 2016)(citation omitted) (quoting 11A Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, Federal Practice & Procedure § 2948 (2d ed. 1995)). This Court should restore the party qualification requirements to their pre-April 2020 levels and uphold the remainder of the Election Law as amended by Part ZZZ of the enacted FY 2021 Transportation, Economic Development and Environmental Conservation Budget Bill as severable from the invalidated portion."

## CONCLUSION

For the reasons set forth above, Plaintiffs' Motion for a Preliminary Injunction should be granted.

Dated: New York, New York
      May 29, 2020

Respectfully submitted,

   /s/ Kevin W. Goering
Kevin W. Goering (KG-5859)
Peter Guirguis (PG-2168)
Alex J. Otchy (5675848)
MINTZ & GOLD LLP
600 Third Avenue, 25th Floor
New York, New York 10016
(212) 696-4848
goering@mintzandgold.com
guirguis@mintzandgold.com
otchy@mintzandgold.com

*Attorneys for Plaintiffs*